# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 23, 2012

## STATE OF TENNESSEE v. RIVERA L. PEOPLES

**Appeal from the Criminal Court of Davidson County**
**No. 2010-A-459      Cheryl A. Blackburn, Judge**

---

**No. M2010-02162-CCA-R3-CD - Filed June 20, 2012**

---

Rivera Peoples ("the Defendant") appeals his jury conviction for first degree felony murder. In his appeal, he asserts that the evidence presented at trial was insufficient to support his conviction. After a thorough review of the record and the applicable law, we affirm the Defendant's conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Nathan S. Moore, Nashville, Tennessee, for the appellant, Rivera Peoples.

Robert E. Cooper, Jr., Attorney General & Reporter; Meredith Devault, Senior Counsel; Victor S. Johnson, III, District Attorney General; Bret Gunn and Brian Ewald, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

A Davidson County Grand Jury indicted the Defendant on counts of first degree felony murder, attempted second degree murder, and employing a firearm during a dangerous

felony. The Defendant went to trial on August 9-11, 2010, on the indicted count of first degree felony murder.[1]

The evidence at trial established that Linburg Thompson ("Victim Thompson"), a fifty-three-year-old father of four, was killed on the night of December 10, 2008, while working at Ace's Market in Nashville. Gift Wilford Bonwe, another individual working at Ace's Market that evening, testified that Victim Thompson had taken out the trash, and, while Victim Thompson was outside, Bonwe heard loud noises that sounded like the slamming of the dumpster lid. As Bonwe walked toward the door, a lady rushed inside and told him that there had been a shooting outside. Bonwe then called the police. Shortly thereafter, a neighbor ran into the store and told Bonwe that Victim Thompson had been shot. Bonwe ran outside and found Victim Thompson on the ground "gasping for his life." Unbeknownst to Bonwe, the lady who reported the shooting had also been shot, and when Bonwe returned into the store, he found her crawling on the floor and asking for help.

The market had a video surveillance system that captured events taking place inside the store and at the entrance to the store. The State played the video for the jury, and Bonwe identified a young man[2] who entered the market prior to the shooting as someone he had seen in the store since he began working at the store eight years ago. While in the store, the young man held up various items and asked Bonwe what each item cost.

Antoinette Bell ("Victim Bell") testified that she was shot at Ace's Market on December 10, 2008. She lived within walking distance of the store, and she was at the market that night buying beer and cigarettes. Standing outside, she observed a silver car across the street and noticed two men get out of the car and walk toward the store. As one of the men walked into the store, Victim Bell asked him for a lighter. He told her that he did not have one, but as he later walked back out of the store, he handed her a lighter. At approximately the same time that the man with the lighter exited the store, Victim Thompson walked out of the store with garbage. Once Victim Thompson walked around the corner toward the dumpster, Victim Bell heard someone say, "go get the money out of the register." She then heard Victim Thompson respond, "I'm not going to get s**t, you go get it yourself." Immediately thereafter, she heard shots fired near the dumpster, and she ran into the store. About a minute or so after running into the store, Victim Bell became dizzy and realized that she herself had been shot. On cross-examination, Victim Bell stated that she did not notice

---

[1] The record does not indicate what happened on the count of attempted second degree murder. Following the trial, the trial court dismissed the count of employing a firearm during a dangerous felony.

[2] Bonwe did not identify the name of the individual who entered the store. However, a later witness, Brian Moreland, who testified as an accomplice, stated that it was James Dowell, another accomplice, who entered the store.

how many people were in the silver automobile. She did not see the face of any other individuals involved in the shooting except for the person from whom she asked for the lighter.

Trey Mosby testified that in December of 2008, he lived within close proximity to Ace's Market. On the night of December 10, 2008, he was at home and observed a silver Chevrolet Impala parked in front of his house. He noticed that there were four black males sitting in the vehicle. Two of the men in the vehicle stepped out and walked toward the store. He noticed that the vehicle's rims were not typical hubcaps but were alloy wheels with emblems. Mosby did not witness the shooting because he and his roommate left their residence right after he observed the men getting out of the vehicle.

Brian Beech testified that he lived directly across the alley from Ace's Market on December 10, 2008. At the time of the shooting, Beech was asleep at home, but he awoke to the sound of four gunshots. He jumped out of bed and ran toward the back of the house to look out the window, at which point he observed a silver Chevrolet Impala driving up the alleyway. The Impala stopped long enough for an individual to enter the back passenger seat and then continued driving up the alleyway. Beech noticed that the vehicle had a "drive-out tag," "some factory rims or some polished rims," and a "spoiler." After the car drove away, Beech walked outside and noticed that Victim Thompson was on the ground. Later, the police escorted Beech to view a vehicle which he identified as the vehicle he had seen in the alley.

Beverly Landstreet testified that on December 10, 2008, she lived next to the alley near Ace's Market. That evening, she heard some gunshots, and when she looked outside, she observed a silver Impala driving slowly up the alleyway. She called the police and spoke with officers once they arrived at the scene. Later, an officer escorted her and her roommate to a location where they identified a vehicle as the one they saw driving in the alley.

Sergeant Monte Sands testified that he had been employed with the Berry Hill Police Department for about twelve years. On the night in question, he received a call to respond to the scene at Ace's Market. Although Ace's Market is right outside Berry Hill and considered part of Metropolitan Nashville, Sands stated that he and other officers sometimes responded anyway out of proximity. He arrived at Ace's Market approximately two minutes after receiving the call, within approximately a minute of two other Berry Hill officers. When he arrived, he observed a black male lying in the alleyway next to the store. Sergeant Sands immediately focused on the victim, and shortly after reaching Victim Thompson, Victim Thompson stopped breathing. The fire department arrived and began attempts to resuscitate the victim, which proved unsuccessful. Shortly thereafter, Sergeant Sands heard a store clerk shouting that there was another victim inside the store. Sergeant Sands

-3-

immediately entered the store to find Victim Bell, who had been shot in her torso and arm. He asked her questions as medics began treating her, but she seemed to be overwhelmed by pain and fear such that she could only tell him her name and date of birth. On cross-examination, Sergeant Sands acknowledged that he did not see any of the suspects and that he played no part in the actual investigation of the shooting.

Lieutenant Matt Pylkas, Metro Police Department ("MPD"), testified that he was working on the night of December 10, 2008. When he received the call about the shooting, Lieutenant Pylkas assisted in searching for the suspects instead of going to the scene of the incident. He received a description that the vehicle was "a silver Impala with a temporary tag" and "an air foiler [sic] on the back." Shortly after reaching the Edgehill area, he observed a vehicle parked alone that matched the description received over the radio. Lieutenant Pylkas exited his vehicle to peer inside the Impala. He observed a stocking cap and some bandanas in the interior of the vehicle, and he placed his hand in front of the engine area and noticed that it was "extremely hot," indicating that the vehicle had been driven recently.

Officer George Bowton, a crime scene investigator for the MPD, testified that on the night of December 10, 2008, he responded to a call regarding a shooting at Ace's Market. As part of his responsibility at the scene, he drew a diagram depicting the scene of the shooting and the location of evidence obtained. Additionally, he collected one bullet and two shell casings as evidence. He identified the two shell casings as Winchester nine millimeter Luger cartridge casings.

Lynette Mace, MPD Crime Scene Investigations, testified that her involvement with the case included investigating the 1999 Chevrolet Impala identified by witnesses as the car used in the commission of the shooting. Her investigation included photographing the vehicle and articles located inside and obtaining those items to submit for analysis of deoxyribonucleic acid ("DNA"), gunshot residue, and fingerprints.

The State read into evidence the depositions of Officer Thomas E. Simpkins, MPD, and Officer Belinda Shea, MPD. Officer Simpkins stated in his deposition that he found fingerprints on approximately seven compact discs that he submitted for fingerprint analysis. In Officer Shea's deposition, she testified as an expert in latent fingerprint identification. She analyzed latent fingerprints submitted in this case by Officer Simpkins and Officer Mace. From the compact discs submitted, she found prints matching those of the Defendant and an individual named Brian Moreland. From the prints lifted from an amplifier located in the trunk, Officer Shea matched a finger print to that of the Defendant. Finally, on a box of dryer sheets, she identified prints as matching those of an individual named James Dowell. Officer Shea acknowledged that she analyzed several prints that she could not match

conclusively to certain individuals. She also agreed that she could not discern the age of a fingerprint from her analysis.

Brian Moreland testified that he was involved in an attempted robbery at Ace's Market on December 10, 2008. He stated that the other individuals involved in the attempted robbery were the Defendant, Dowell, and Harris. He had known these other men for approximately a few months prior to the incident, and he identified the Defendant and Harris as brothers. On the night of the shooting, the four men determined that they needed some money, so they decided to drive around the area until they found a place to rob. Moreland confirmed that they were riding in the Defendant's car and that the Defendant was driving. They took with them gloves, hats, bandanas, and two guns, and they eventually decided to rob Ace's Market.

Moreland further testified that upon reaching the store, Dowell exited the vehicle and walked toward the store. At some point, Dowell entered the store, and the Defendant listened by cell phone from the car. When Dowell left the store, the Defendant drove the car up to the side of Ace's Market to retrieve Dowell. As Dowell was about to get into the car, Harris jumped out of the car. Harris confronted a man standing outside, "and when the dude swung at [Harris], [Harris] shot" the man twice. Immediately thereafter, Harris approached the front of the store, and, although Moreland could not see Harris at this point, Moreland heard another gunshot. Harris returned to the vehicle, and the four men drove away to the Edgehill Housing Development, where Harris's girlfriend lived and where Harris was staying at the time.

Moreland stayed at Harris's girlfriend's residence for a few hours, and at some point, the four men saw police surrounding the Defendant's vehicle from the window. The police eventually knocked on the door, but no one answered the door. Moreland acknowledged that he had been charged with the same crime as the Defendant, and, although he had not been promised anything for his testimony, he hoped that his testimony would be beneficial to the resolution of his case.

On cross-examination, Moreland agreed that he never intended for anyone to get shot or hurt. He also acknowledged that, when Harris jumped out of the vehicle, Harris was acting on his own accord and Moreland did not know what Harris was doing. However, on redirect examination, Moreland admitted that all of the men were planning to get out of the car but that Harris simply jumped out of the car sooner than Moreland anticipated.

Detective Jill Weaver, MPD, testified that she interviewed approximately fifteen individuals throughout the investigation of this case, including all four individuals allegedly involved in the attempted robbery. The State played a video that consisted of Detective

Weaver interviewing the Defendant. In the video, the Defendant explained that on the night of the shooting he went to the mall with his brother in the Defendant's vehicle. When they returned from the mall, he left his vehicle at his residence, and his daughter's mother picked him up and drove him to Fairview for the evening. The Defendant also referred to his association in the "GD's," which Detective Weaver explained was a reference to a gang called the Gangster Disciples.

Jerome Bonsu testified that he owns an automobile dealership on Dickerson Pike. He identified a bill of sale from his company bearing the name of the Defendant as the purchaser of a gray Chevrolet Impala on November 24, 2008. Bonsu confirmed that he sold the vehicle to the Defendant. He also identified a reference sheet included with the Defendant's file that listed phone numbers for Antonio Harris, Brian Moreland, James Dowell, and Shamika Harris. On the bill of sale, the Defendant also provided his cell phone number.

Agent Richard Littlehale, Tennessee Bureau of Investigation ("TBI"), testified as a communications analyst in crime investigations. He received phone records for the cell phone numbers of the Defendant, Moreland, Dowell, and Harris, which were admitted as evidence at trial. Each cell phone record included a reference to the cell tower used to transmit each call. He then calculated the distance from that tower to pertinent locations in the case. He explained that in an urban area, cell towers were approximately one or two miles apart. Calls customarily are transmitted from the cell tower that is closest to the location of the cell phone. From his calculation, a call made by the Defendant at the approximate time of the shooting was transmitted from a tower point six four three (0.643) miles from the scene of the shooting.

Dr. Thomas Deering, a medical examiner and forensic pathologist with Forensic Medical Management Services, testified that he performed an autopsy on Victim Thompson. He stated that in his examination, he found one bullet still within Victim Thompson's body and other wounds indicating the entrance and exit of an additional bullet. Both of the gunshot paths were in the victim's left abdomen. One bullet penetrated ribs, the small intestine, the large intestine, and the aorta. The other bullet fractured the top of the hip bone. Dr. Deering discovered a significant amount of blood in Victim Thomspon's abdomen. He opined that the first bullet was fatal but that one could potentially survive had he or she only received the bullet that fractured the hip. Dr. Deering concluded that Victim Thompson died as a result of multiple gunshot wounds to the abdomen.

Cassaundra Waters testified that in December of 2008, she had been dating the Defendant for about a month. She worked with Lisa Anderson, the girlfriend of Harris, and because Waters was separated from her husband at the time, she also lived with Anderson. According to Waters, on the evening of December 10, 2008, the Defendant left with Harris

to go to the mall. After they returned to Anderson's residence, police came to the door, but no one answered the door. Waters could not recall whether the Defendant spent the night at Anderson's residence that night. The next day, Waters and the Defendant observed a news story on television regarding the shooting at Ace's Market. The Defendant told Waters that the Defendant, Harris, Dowell, and Moreland went to the store that evening with the purpose of robbing it.

Jamesia Dowell, sister of Dowell, testified that she has had a relationship with the Defendant and that they had two children together. In December of 2008, she lived in Fairview. Early one morning, the Defendant woke Jamesia by calling her to request that she say that he was in Fairview if anyone asked her about his whereabouts on the night of December 10, 2008. She acknowledged that he was not, in fact, in Fairview on that date.

Agent Alex Brodhag, TBI, testified as an expert in the field of firearms identification. He analyzed two fired nine millimeter cartridge cases and two fired nine millimeter jacketed bullets obtained in this case. From his analysis, he determined that the two bullets had been fired from the same firearm and that the two cartridge cases had been fired from the same firearm. However, he could not confirm that the bullets and cartridge cases were both fired from the same firearm.

Agent James Russell Davis, II, TBI, testified as an expert in the field of microanalysis. He explained that when a weapon is fired, gunpowder settles on all the objects in close proximity to the weapon. He tested gloves found throughout the Defendant's Impala including: one glove from the trunk, two pairs from the rear seat area, and a pair located in the glove box. From his analysis, Agent Davis discovered that there was gunshot residue on all the gloves tested.

Agent Michael Turbeville, TBI, testified as an expert in the field of DNA analysis. He tested a number of items in an attempt to discover DNA profiles on the items. On a pair of black gloves recovered from the rear passenger area of the Defendant's Impala was a mixture of DNA matching Harris, Dowell, the Defendant, and a female. He also matched the DNA found on a black bandana in the glove box to Harris. Regarding the pair of gloves found in the glove box, one glove had DNA consistent with that of Harris and Dowell, with the possibility of Moreland and a female as additional contributors. The corresponding glove contained DNA matching that of Harris and Dowell, with the possibility of the Defendant and a female as additional contributors. A black bandana from the rear passenger area of the vehicle matched the DNA of Harris and Dowell. Based on the analysis of an additional pair of gloves retrieved from the rear passenger area of the vehicle, Agent Turbeville discovered DNA on one glove consistent with that of Harris, Dowell, and Moreland, with the possibility of a match to the Defendant and a female. With regard to the corresponding glove, he

discovered DNA consistent with that of the Defendant, Dowell, and Moreland, with the possibility of Harris and a female as additional contributors. From a bandana found in a pocket in the back passenger seat, Agent Turbeville discovered DNA matching that of the Defendant and Moreland. Another bandana found in that pocket contained DNA consistent with that of Dowell. Agent Turbeville opined that tennis shoes found in the car matched the Defendant's DNA as well as a female's DNA. A white shirt retrieved from the rear floorboard contained DNA consistent with that of the Defendant and a female. Additionally, Agent Turbeville obtained nasal secretion from the shirt that matched the Defendant's DNA.

At the conclusion of the State's proof, the Defendant moved for a judgment of acquittal, and the trial court denied the motion. The Defendant then took the stand and testified that on the evening of December 10, 2008, he drove to the mall with his brother, Harris, and Dowell to buy shoes for his daughter. The State asked the Defendant why he did not mention to the police that Dowell went with him to the mall. He responded, "I guess, when you tell one lie, you've just got to continue. You have to build on that lie. So when you tell one lie, you've got to continue to tell another lie to cover that first one up." After returning from the mall to the Edgehill area, Harris asked to borrow the Defendant's car. According to the Defendant, Harris, Dowell, and Moreland then left for approximately fifteen to twenty minutes. When they returned, Harris told the Defendant that someone had been shot.

At the close of proof, the jury deliberated and returned a verdict of guilty for first degree felony murder. The trial court sentenced the Defendant to an automatic life sentence. The Defendant filed a motion for new trial, which the trial court subsequently denied. He now appeals, arguing that the evidence is insufficient to support the jury's verdict.[3]

## ANALYSIS

## Sufficiency of the Evidence

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption

---

[3] The Defendant timely filed a notice of appeal, but he inadvertently listed the wrong case number. He then filed a corrected notice of appeal on November 12, 2010, two days after the filing deadline. However, because the Defendant timely filed the initial notice of appeal and the State has raised no issue as to the corrected notice of appeal, we will treat the Defendant as having appealed in a timely manner.

of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citation omitted).

The Defendant contends that the evidence is not sufficient to support his first degree felony murder conviction. First degree felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 2007). Therefore, we first must consider whether the evidence was sufficient for the jury to determine that the Defendant committed one of the underlying felonies required to convict the Defendant of first degree felony murder. The State's theory of the case was that the Defendant committed an attempted aggravated robbery under the theory of criminal responsibility.

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2006). A robbery becomes aggravated when it is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be

a deadly weapon." Tenn. Code Ann. § 39-13-402(a) (2006). Criminal attempt is defined in pertinent part as:

> [one] who, acting with the kind of culpability otherwise required for the offense:
>
> > (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
> >
> > (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> >
> > (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3) (2006).[4] Thus, a defendant commits criminal attempt when he or she engages in "conduct constituting a substantial step toward the commission of the offense." State v. Davis, 354 S.W.3d 718, 730 (Tenn. 2011) (quoting State v. Richardson, 251 S.W.3d 438, 443 (Tenn. 2008) (overruled on other grounds)).

A person is criminally responsible for an offense committed by another person when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (2006). Our supreme court has explained that our criminal responsibility statute is premised on the view that "in addition to the primary criminal actor, aiders and abettors should be held accountable for the criminal harms they intentionally facilitated or helped set in motion." State v. Hatcher, 310 S.W.3d 788, 811 (Tenn. 2010) (quoting State v. Sherman, 266 S.W.3d 395, 408 (Tenn. 2008)). While a person's mere presence during the commission of a crime is not sufficient to confer criminal liability, it is not necessary that one physically commit the underlying offense; encouragement of the principal actor will establish such liability. Sherman, 266 S.W.3d at 408. A person convicted under a theory of criminal responsibility is considered a principle

---

[4] The jury charge in this case is not included in the record. Therefore, we are unable to determine which of these provisions the trial court utilized in its charge to the jury.

offender as if they committed the underlying offense themselves. Hatcher, 310 S.W.3d at 811.

The Defendant contends that the State failed to present sufficient evidence to establish that the Defendant was criminally responsible for the attempted aggravated robbery at Ace's Market. He argues that the only proof placing him at the scene showed that he stayed in the vehicle during the entirety of the incident. Moreover, because Moreland testified that the original plan was for all four men to enter the store to rob it, the Defendant asserts that his staying in the vehicle evidences his desire to withdraw from the robbery.

Victim Bell testified that as she was standing outside the store, Victim Thompson exited the store with trash to place in the dumpster. She then heard an individual say to Victim Thompson, "go get the money out of the register," and she heard Victim Thompson respond, "I'm not going to get s**t, you go get it yourself." Victim Bell immediately heard gunshots, and she ran into the store. Moreover, Moreland testified that when Harris exited the vehicle, he approached Victim Thompson to confront him. In Moreland's words, "when the dude swung at [Harris], [Harris] shot" Victim Thompson. Thus, the evidence sufficiently established that Harris attempted to commit an aggravated robbery by demanding money from Victim Thompson and using a gun in the commission thereof. Moreover, in the process of attempting to commit the robbery, the evidence sufficiently established that Harris shot Victim Thompson.

Turning to whether there was sufficient evidence that the Defendant was criminally responsible, Moreland testified at trial that the four men decided to rob Ace's Market because they needed some money. The Defendant drove the other three men to and from the store in his own car. According to Moreland, Dowell initially exited the car alone and entered the store, but the Defendant listened to Dowell's interactions in the store by cell phone. Although Moreland acknowledged that he was surprised when Harris jumped out of the car, Moreland also admitted that all of the men were about to exit the car and Harris merely jumped out earlier than Moreland anticipated.

In Tennessee, it is well-established that an accomplice's uncorroborated testimony cannot be the sole basis of a defendant's conviction. State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004); see also State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964). Specifically,

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing

the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.

Bough, 152 S.W.3d at 464 (quoting Bane, 57 S.W.3d at 419).

In the case before us, Mosby, who lived close to Ace's Market, testified that he observed a silver Chevrolet Impala parked outside his house shortly before the shooting with four black males sitting inside. Beech, who lived across the alley from Ace's Market, observed the silver Chevrolet Impala driving up the alleyway and picking up an individual. Moreover, cell phone records indicated that the Defendant was somewhere in close proximity to Ace's Market at the time of the shooting, and several witnesses identified the Defendant's car as the vehicle used in the commission of the shooting. Finally, Waters, the Defendant's then girlfriend, testified that the day after the shooting, the Defendant told her that he and the three other men had gone to Ace's Market the night before with the purpose of robbing it. Therefore, the evidence presented at trial provided ample corroboration to Moreland's testimony that the Defendant "acted with the intent to promote or assist the commission" of the attempted aggravated robbery. See Tenn. Code Ann. § 39-11-402(2).

To the extent the Defendant's testimony contradicts the testimony of the State's witnesses, we will not disturb the jury's implicit credibility findings. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993). The State presented ample evidence for the jury to conclude that the Defendant, with the intent to rob Ace's Market, aided Harris by driving his vehicle to and from the scene as well as listening on his cell phone as Dowell entered the store. Thus, there is sufficient evidence to establish that the Defendant was criminally responsible for the attempted aggravated robbery at Ace's Market.

We must also determine whether there was sufficient evidence to determine that someone was killed in the commission of the above felony. Testimony established that Victim Thompson died as a result of multiple gunshot wounds to the abdomen. Additionally, according to Victim Bell, Victim Thompson sustained those fatal gunshot wounds immediately after telling the man confronting him that he would not take money from the store's cash register. The State clearly presented sufficient evidence to establish that an individual died in the commission of the attempted aggravated robbery. Therefore, the evidence is sufficient to support the Defendant's first degree felony murder conviction, and he is entitled to no relief.

## CONCLUSION

For the reasons articulated above, we affirm the Defendant's conviction for first degree felony murder.

_____
JEFFREY S. BIVINS, JUDGE